UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH
CIVIL ACTION NO. 5:16-CV-129-TBR

MELISSA MORRIS,                                                    PLAINTIFF

v.

ZURICH AMERICAN INSURANCE CO., et al.,                            DEFENDANTS

### Memorandum Opinion and Order

This matter comes before the Court upon Motion by Defendants Zurich American Insurance Company[1] and Zurich American Insurance Company of Illinois,[2] (collectively, "Defendants"), for summary judgment against Plaintiff Melissa Morris, ("Morris"). [DN 23.] Morris has responded, [DN 41], and Defendants have replied. [DN 56]. This matter is ripe for adjudication and, for the reasons that follow, **IT IS HEREBY ORDERED** that Defendants' Motion, [DN 23], is **GRANTED in part and DENIED in part**.

### A. Background

"Morris was injured in an automobile accident on September 18, 2008. The person driving the [other] vehicle in the accident was Edgar Heinkel," who "was an employee of SMCS Terminix at the time of the accident." [DN 1-2, at 2.] Heinkel was driving his company truck when the accident occurred. [*Id.*] "As a result of Heinkel's employment, he was insured under a commercial auto policy that [D]efendant Zurich American Insurance Company issued to" ServiceMaster, a company which oversees the operation of numerous brands, including Terminix. [DN 23-2, at 2.] That policy held the following policy number: BAP 2938657-03. [DN

---

[1] This Defendant will be referred to throughout this Memorandum Opinion as "Zurich American."
[2] This Defendant will be referred to throughout this Memorandum Opinion as "Zurich Illinois."

1-2, at 2.] According to Defendants' instant Motion, Zurich Illinois did not insure ServiceMaster or any of the companies under ServiceMaster's corporate umbrella. [DN 23-2, at 3.]

As a result of the underlying accident, Morris claims that she suffered "a disk injury to her neck and lower back," for which she received medical treatment. [DN 41-1, at 3.] Further, "[w]hile Ms. Morris continued to treat her injuries, her attorney [at that time], Kevin Monsour, sent a settlement demand to Zurich [American] on July 20, 2011 in the amount of $175,000. Although Zurich [American] confirmed receipt of the settlement demand on August 9, 2011, Zurich [American] did not settle, counter or attempt in any way to respond…." [*Id.*] As a result, Morris "filed suit in Jefferson County Circuit Court on September 19, 2011." [*Id.*] According to Morris's Amended Complaint, filed in state court before removal from Christian County Circuit Court, Zurich American "orally offered to settle [her] claim for $25,000 in 2015, which was later increased orally to $75,000, and then [Zurich American] later orally suggested they would be willing to go as high as six figures." [DN 1-2, at 3.]

The underlying policy, BAP 2938657-03, "had a $5,000,000 liability limit and a $3,000,000 liability deductible." [DN 23-2, at 2; DN 23-5, at 1.] After the underlying litigation commenced, in Morris's responses to Defendants' interrogatories, she indicated that her claim was worth $1,900,000. There is no evidence that she ever sought or contended she was entitled to more than that sum. In her state court Amended Complaint, Morris alleged that Defendants engaged in bad faith in the following ways: (1) "fail[ing] to acknowledge and act reasonably promptly upon communications with respect to a claim arising under the [relevant] insurance policies," (2) "refus[ing] to pay claims without conducting a reasonable investigation based upon all available information," (3) failing to "attempt in good-faith to effectuate prompt, fair, and equitable settlement of [her] claim in which liability had become reasonably clear and damages

became reasonably certain," (4) "fail[ing] to adopt and implement a reasonable standard for the prompt investigation of claims arising under" the relevant "insurance policies," (5) "compel[ling] [Morris] to institute litigation to recover amounts due under the insurance policy by not offering any payment and then offering substantially less than the amount ultimately recovered by [Morris] in the underlying action," (6) "attempt[ing] to settle [Morris's] claims for less than the amount to which a reasonable person would have believed she was entitled by reference to written or printed advertising material disseminated by Zurich," and (7) "fail[ing] to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts and applicable law for denial of [Morris's] claim or for the offer of a compromised settlement in her claim." [DN 1-2, at 3-4.]

## B. Legal Standard

Rule 56 of the Federal Rules of Civil Procedure instructs that "[t][he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion." Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party." *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Additionally, "[t]he judge is not to 'weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

"The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists." *Am. Guarantee and Liability Ins. Co. v. Norfolk S. Rwy. Co.*, 278 F. Supp.

3d 1025, 1037 (E.D. Tenn. 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The movant "may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply 'by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex*, 477 U.S. at 325). Should the movant carry his or her burden here, "[t]he non-moving party…may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 47 U.S. at 586). Finally, "[t]he mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to defeat a motion for summary judgment; there must be evidence on which the jury could reasonably find for the non-moving party." *Id.* (internal citations and brackets omitted). This means that "[i]f the [non-moving] party fails to make a sufficient showing on an[y] essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment." *Am. Guarantee and Liability Ins. Co.*, 278 F. Supp. 3d at 1037 (citing *Celotex*, 477 U.S. 323).

### C. Discussion

### 1. Background Law

"Kentucky law recognizes four categories of bad faith claims against insurance companies," which are as follows:

> (1) common law third-party bad faith, which may occur when a liability insurer fails to settle a tort claim against its insured; (2) common law first-party bad faith, which occurs when an insurer refuses to pay the claim of its own insured under a first-party policy provision; (3) first-party bad faith under the Kentucky Consumer Protection Act ('KCPA'); and (4) first-party and third-party bad faith under the Kentucky Unfair Claims Settlement Practices Act ('KUCSPA'), which imposes what is generally known as the duty of good faith and fair dealing owed by an

insurer to an insured and sets forth a list of particular duties and practices which constitute unfair claims settlement.

*Foster v. Am. Fire and Casualty Co.*, 219 F. Supp. 3d 590, 594 (E.D. Ky. 2016) (citing *Knotts v. Zurich Ins. Co.*, 197 S.W.3d 512, 515 (Ky. 2006); *Rawe v. Liberty Mutual Fire Ins. Co.*, 462 F.3d 521, 526-27 (6th Cir. 2006)).

Here, Morris has made claims for (1) common law third-party bad faith, and (2) third-party bad faith under the KUCSPA. [*See generally* DN 1-2.] In *Davidson v. Am. Freightways, Inc.*, 25 S.W.3d 94, 100 (Ky. 2000), the Kentucky Supreme Court restated the rule first explained in *Wittmer v. Jones*, 864 S.W.2d 885 (Ky. 1993), namely, that irrespective of whether a bad faith claim is brought by a first-party claimant or a third-party claimant, or "whether premised upon common law theory or a statutory violation," "all of the bad faith liability theories [have been gathered] under one roof" and there is one test applicable to all four above theories. That test is as follows:

(1) [t]he insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed.

*Id.* (quotation marks and citations omitted).

## 2. Admissibility of Laura Stengl's Affidavit

Although Morris's claims are for bad faith, the first issue the Court must decide is the admissibility of Laura Stengl's affidavit, (the "Stengl Affidavit"), which was attached to the instant Motion. Stengl, a claims specialist with Zurich American, completed an affidavit in which, among other things, she avers that Morris's settlement demands always fell under the $3,000,000 deductible, and that Morris's underlying claims were "genuinely disputed throughout." [DN 58.] Morris argues in her Response to the instant Motion that the Court should

not consider the Stengl Affidavit in reaching its decision on whether to grant summary judgment in favor of Defendants for three broad reasons: first, Morris argues that the Stengl Affidavit does not comply with Federal Rule of Civil Procedure 56(c)(4) or Kentucky statutory requirements; second, Morris argues that Stengl is not competent to make averments concerning issues that transpired before her term of employment started with Zurich American; third, Morris argues that Stengl improperly and irrelevantly relies on litigation materials to reach a conclusion concerning the underlying settlement. [*See* DN 41-1, at 5-7.] Defendants do not mention Stengl or her affidavit in their Reply, nor do they respond to Morris's arguments concerning the document. [*See generally* DN 56.]

With respect to her first argument, Morris claims that the Stengl Affidavit does not comport with Rule 56(c)(4) because it was "not made upon personal knowledge and makes statements that are not supported by the record. Nor does she cite to the record to support her statements." [DN 41-1, at 5.] Of course, an affiant need not cite to the actual Record of a case in order for their averments to be legitimate, or for the Court to consider them in reaching a decision. Morris also contends that the Stengl Affidavit "does not comply with the Kentucky statutory requirements" because it "fails to certify [that Stengl] appeared before the notary personally and execute the instrument." [*Id.*] However, the document provides the following signed declaration by Jacqueline Thomas, the notary public in question: "Subscribed and sworn to *before me* this 1st day of February, 2018 by Laura J. Stengl." [DN 58 (emphasis added).] The Court finds that this standard declaration satisfies any concerns Morris may have concerning the document's authenticity and compliance with relevant statutory authority.

Next, the Court finds Morris's argument that Stengl lacks personal knowledge of the facts about which she makes averments, or that she is somehow incompetent to discuss these matters,

to lack merit. Stengl is clear that she was not assigned as a claims representative on Morris's underlying claim until April 2012. [*Id.*] And although Stengl makes averments about "pre-litigation" issues, the Court is satisfied that, as the claims representative assigned to Morris's case, she would have been made aware of the case history as well as its pertinent facts. Moreover, even if the Court were to disregard the sections of the Stengl Affidavit which relate to incidents occurring before her term of employment with Zurich American commenced, the Court would still have that information through other sources. Specifically, Morris does not contend that she ever made settlement demands that equaled or exceeded the $3,000,000 deductible.

The final section of the Stengl Affidavit with which Morris takes issue is Stengl's averment that her "tort case against Mr. Heinkel and his employer was genuinely disputed throughout." [*Id.*] In support of this averment, Stengl states that, in her answers to Defendants' interrogatories, "Morris claimed total damages of $1,900,000," and that "Morris's lawsuit against Mr. Heinkel and his employer was settled for less than 10% of the amount claimed by Ms. Morris in those interrogatory answers," thereby demonstrating, in Stengl's view, a genuine dispute. [*Id.*] Morris argues that Stengl's averment that her claim was "genuinely disputed…is not true and not supported by admissible evidence…." [DN 41-1, at 5.] Additionally, Morris argues that this statement "is simply an unsupported self-serving conclusory statement. This statement is inconsistent with the other evidence produced by defendants. Ms. Stengl does not state any facts to support or provide a reasonable inference why the claims were genuinely disputed in good faith." [*Id.* at 5-6.] Again, it is uncontested that Morris, at one time, claimed her case was worth $1,900,000, and that she ultimately settled for a much smaller figure, $116,432. And Morris may argue that this Court cannot consider her answers to interrogatories, but the case law in the Sixth Circuit bears out the rule that, "under Federal Rule of Civil Procedure 56(c), a

district court may consider answers to interrogatories when reviewing a motion for summary judgment so long as the content of those interrogatories would be admissible at trial, and this includes a party's own responses to interrogatories." *Bokhari v. Metro. Gov't of Nashville and Davidson Cnty.*, No. 3:11-00088, 2012 WL 6018710, at *6 n.3 (M.D. Tenn. Dec. 3, 2012) (internal quotation marks and citations omitted). In her response to an interrogatory, she set out $1,900,000 as the value of her claim. The Court finds that it may consider the Stengl Affidavit in deciding this Motion. However, the Court *does* make note of the core problem with which Morris takes issue, namely, Stengl's statement that Morris's case was "genuinely disputed throughout." This statement, standing alone, though, is insufficient to find as a matter of law that there was, in fact, a genuine dispute regarding Morris's underlying claim. In other words, this statement from Stengl, largely conclusory in nature, does not guide this Court's decision.

### 3. Morris's Collateral Estoppel Argument

The next issue for the Court's review is Morris's argument that Defendants are collaterally estopped from claiming that one or both of them possessed no contractual obligation to pay out Morris's claim (the first element of a bad faith claim) when her claim has, in fact, already been paid by way of a settlement. [DN 41-1, at 11.] Specifically, Morris argues that Defendants paid for the property damage to the vehicles involved in the underlying incident, they paid for the bodily injury claims arising from the underlying incident, and by virtue of the fact that Defendants have "already paid damages claims on four vehicles and at least three different bodily injury claims, [Defendants are] estopped from now claiming there was no contractual duty to pay the claim. There is a presumption that [Defendants] cannot overcome." [*Id.* 11-12.] In their Reply, Defendants argue that, because "Morris's underlying tort claims were settled, not

litigated to a final judgment," this "defeats Morris's issue-preclusion argument…." [DN 56, at 4-5.]

Issue preclusion, commonly referred to as collateral estoppel, "precludes issues of a prior adjudication from being relitigated." *Revenue Cabinet, Commonwealth of Kentucky v. Samani*, 757 S.W.2d 199, 201 (Ky. Ct. App. 1988). "The essential elements of collateral estoppel are: (1) identity of issues; (2) a final decision or judgment on the merits; (3) a necessary issue with the estopped party given a full and fair opportunity to litigate; and (4) a prior losing litigant." *Swinford Trucking Co., Inc. v. Paducah Bank & Trust Co.*, 314 S.W.3d 310, 311 (Ky. Ct. App. 2010) (citing *Moore v. Commonwealth, Cabinet for Human Res.*, 954 S.W.2d 317, 319 (Ky. 1997)). The purpose of such a rule is "to promote judicial economy and finality." *Id.*

Importantly, the Supreme Court has made clear that "settlements ordinarily occasion no *issue preclusion* (sometimes called collateral estoppel), unless it is clear…that the parties intend their agreement to have such an effect." *Arizona v. California*, 530 U.S. 392, 414 (2000). Morris makes no argument that the issue of one or both of Defendants' contractual obligations to pay out her underlying claim was litigated to a final decision or judgment, and no evidence has been adduced which tends to show that the settlement entered into between Zurich American and Morris was intended to have a preclusive effect on the issue of Zurich American's contractual obligation to pay out such claims. Accordingly, the Court finds that issue preclusion does not apply here.

### 4. Zurich Illinois' Place in the Case

The next issue is the inclusion of Zurich Illinois in this case. Morris has sued both Zurich American and Zurich Illinois, but Defendants claim that the insurance policy at issue, BAP 2938657-03, "show[s] that Zurich American Insurance Company (not Zurich American

Insurance Company of Illinois) issued" the policy. [DN 23-2, at 10.] Thus, Defendants argue, "Zurich American Insurance Company of Illinois was never obligated to pay Morris's underlying tort claims and it is entitled to summary judgment…." [*Id.*]

In her Response, Morris argues that, "[o]n the 'In Witness Clause' page of the policy…it states 'we agree with you to provide insurance as stated in this policy.' The document is signed by Thomas A. Bradley, President Zurich North America. The list of company entities included under his signature includes Zurich American…and Zurich [Illinois]." [DN 41-1, at 10.] Apart from this, Morris argues that Zurich Illinois "is probably listed as a party guaranteeing payments of claims pursuant to the insurance policy," but "[b]ecause defendants have not provided all effective contracts that govern this policy, plaintiff does not have the benefit of referring to the specific portions or pages." [*Id.* at 10-11.]

The fact that the "In Witness Clause" that Bradley signed evidences his status as President of both Zurich American and Zurich Illinois cannot, in and of itself, preclude summary judgment where a claim of bad faith is involved. Bradley apparently also oversees American Guarantee and Liability Insurance Company and American Zurich Insurance Company, which have not been sued here. [*See* DN 41-4, at 2.] All Morris can offer with respect to Zurich Illinois is that it is "probably" listed as a guarantor concerning insurance payments. But allegations in a Response do not constitute evidence, and the Court finds that Morris has not produced a scintilla of evidence that Zurich Illinois is liable for bad faith, or was ever contractually obligated to pay out the underlying claim. Accordingly, the Court will dismiss Zurich Illinois from this action.

### 5. Contractual Obligation to Pay

Having dismissed Zurich Illinois from this case, the Court will now shift its focus to the arguments presented by Zurich American, the remaining Defendant, as to why, in its view,

summary judgment is warranted in this case.[3] Zurich American makes numerous arguments in support of its instant Motion, the first and most detailed of which relates to the question of whether Zurich American was ever obligated to pay Morris's underlying tort claims against Heinkel and his employer, meaning that her bad faith claims would fail as a matter of law. [*See* DN 23-2, at 3.] Under Kentucky law, "[a]bsent a contractual obligation, there simply is no bad faith cause of action, either at common law or by statute." *Davidson v. Am. Freightways, Inc.*, 25 S.W.3d 94, 100 (Ky. 2000). Also, "both the statute and the common law tort apply only to persons or entities engaged in the business of insurance." *Id.* at 95. "Kentucky case law clearly acknowledges that a contractual obligation must exist in order to find a party liable under the [KUCSPA] or the common law duty to act in good faith." *Daugherty v. Am. Express Co.*, No. 3:08-cv-00048, 2010 WL 4683758, at *4 (W.D. Ky. Nov. 12, 2010).

Zurich American contends that this case bears a striking resemblance to the facts of *Davidson*. *See* 25 S.W.3d at 94. There, as here, the underlying incident was an auto accident, although in *Davidson* the wreck involved two tractor-trailer rigs; one was owned by Joseph Davidson and operated by Thomas Davidson, and the other was owned by American Freightways and operated by one of its employees. *Id.* at 95. American Freightways was insured by Protective Insurance Company, ("PIC"), and its policy contained a $250,000 deductible. *Id.* However, American Freightways and not PIC conducted the investigation of the underlying incident, it negotiated on its own behalf, litigated the issue and paid the underlying claims with its own money. *Id.* Afterwards, the Davidsons filed a bad faith case against the company. *Id.* In affirming the decisions of the Jefferson County Circuit Court and the Kentucky Court of Appeals, the Kentucky Supreme Court held that the Kentucky "legislature did not intend to

---

[3] Having dismissed Zurich Illinois from this case, the Court will, hereinafter, refer only to "Zurich American," as opposed to the previously-used "Defendants."

subject self-insured or uninsured persons or entities to the technical requirements of the Kentucky Insurance Code and its attendant regulations," and held "that the [KUCSPA] and the tort of 'bad faith' appl[ied] only to those persons or entities (and their agents) who are 'engaged…in the business of entering into contracts of insurance.'" *Id.* at 102 (quoting KRS 304.1-040). Of course, as a trucking company, American Freightways was not in the business of insurance.

Likening *Davidson* to this case, Zurich American argues that it "is analogous to American Freightways' insurer [PIC] and [ServiceMaster] is analogous to American Freightways." [DN 23-2, at 4.] Zurich American argues that this is the case because it "was insulated from paying Melissa Morris's tort claims by [ServiceMaster's] $3,000,000 deductible," and because ServiceMaster's deductible "made it responsible for paying Melissa Morris's tort claims with its own money." [*Id.* at 4-5.] Of course, Zurich American does concede that the ultimate issue in *Davidson* was "whether the plaintiff could hold American Freightways (a non-insurer) liable for bad faith…." [*Id.* at 5.] Essentially, Zurich American is arguing that there was no obligation placed upon it to pay Morris's underlying tort claims because her claims and/or demands never exceeded the $3,000,000 liability deductible, meaning, in Zurich American's view, that ServiceMaster was "self-insured up to $3,000,000." [*Id.* at 2.] It contends that this would have made it a "third-party claims handler for claims of $3,000,000 or less." [*Id.*] Morris, of course, disputes ServiceMaster's alleged status as "self-insured" and Zurich American's alleged status as a "third-party claims handler."

In order to answer the question of whether ServiceMaster could be considered "self-insured," the Court looks first to *Black's Law Dictionary*. This well-known and oft-cited source defines the term "self-insurance" as "[a] plan under which a business maintains its own special

fund to cover any loss. Unlike other forms of insurance, *there is no contract with an insurance company*. *Black's Law Dictionary* (10th ed. 2014) (emphasis added). Of course, in this case it is uncontested that ServiceMaster had a contract with Zurich American, which is an insurance company. There is also the issue that no evidence has been adduced, nor any arguments made, that ServiceMaster maintains some sort of special fund from which it extracts money to pay for claims such as Morris's one, although Zurich American indicates several times that ServiceMaster was required to repay amounts expended by Zurich American which were under the deductible limit as part of a fronting agreement.

Looking back to *Davidson* for further guidance on the issue, the Kentucky Supreme Court there noted that companies must take certain steps in order to qualify as "self-insured" and found that American Freightways had not complied with the relevant statute, KRS 304.39-080(7), meaning that it "ha[d] not qualified as a 'self-insured' under Kentucky law." *Davidson*, 25 S.W.3d at 95 (citing KRS 304.39-080(6)). That statute, KRS 304.39-080(7), lays out various steps an entity must take in order to qualify as self-insured in Kentucky, and also requires the entity to obtain the approval of the Commissioner of Insurance.[4] In its instant Motion, Zurich American does not contend that ServiceMaster has complied (or has tried to comply) with this statutory provision, nor is the statutory provision even mentioned in its brief, and no exhibits attached thereto evidence such efforts. It is, therefore, uncontested that, at least statutorily speaking, ServiceMaster was not self-insured under Kentucky law. Nevertheless, Zurich American argues that the $3,000,000 deductible "*effectively* made [ServiceMaster] self-insured" up to that amount. [DN 23-2, at 2 (emphasis added).] To wit, Zurich American cites back to

---

[4] Justice Donald Wintersheimer, dissenting in *Davidson*, succinctly explained these steps: "In order to qualify as a self-insurer, the owner must file in satisfactory form with the Commissioner of Insurance: 1) a continuing undertaking to pay tort liabilities or basic reparations benefits; 2) evidence of prompt and efficient administration of all claims, benefits and obligations; and 3) evidence of reliable financial arrangements substantially equivalent to an insurance policy." *Davidson*, 25 S.W.3d at 103 (Wintersheimer, J., dissenting).

*Davidson* for the proposition that "the [court] held that an insured with [a] $250,000 deductible was effectively self-insured against a $71,000 claim." [*Id.* at n.5.] However, the full quotation from the Kentucky Supreme Court on the issue is as follows: American Freightways "is an interstate motor carrier and had complied with the requirements of 49 U.S.C. § 31139(b) and (e), thus had qualified as a 'self-insured' under federal law to the extent of its $250,000.00 deductible. However, it had not complied with KRS 304.39-080(7), thus *had not qualified as a 'self-insured' under Kentucky law*." *Davidson*, 25 S.W.3d at 95 (emphasis added). In *Davidson*, it was the plaintiffs-appellants who attempted to characterize American Freightways as self-insured, "presumably because KRS 304.12-220 specifically provides that the [KUCSPA] does not apply to 'an insured.'" *Id.*

Here, the Court finds no allegations or evidence that ServiceMaster had somehow complied with a federal law-equivalent for qualification as a self-insurer, as American Freightways did in *Davidson*, and Zurich American does not contend that ServiceMaster took the necessary steps under Kentucky law to become self-insured either. Rather, Zurich American appears to seek a rule establishing a company's qualification for self-insured status that circumvents the relevant statutory authority, *i.e.*, that an entity can be *de facto* self-insured by virtue of the fact that the value or demands of a given claim fall below the uppermost threshold of that entity's insurance liability deductible. However, even setting aside the requirement of compliance with the statute and approval by the Kentucky Commissioner of Insurance, Zurich American has not shown that ServiceMaster took any of the required steps outlined above: there is no evidence that ServiceMaster assumed "a continuing undertaking to pay tort liabilities or basic reparations benefits" other than amounts under the $3,000,000 deductible with Zurich American; there is no evidence that ServiceMaster maintains a department in which "prompt and

efficient administration of all claims, benefits and obligations" are handled; and there is no evidence of "reliable financial arrangements [at ServiceMaster] substantially equivalent to an insurance policy." *See Davidson*, 25 S.W.3d at 103 (Wintersheimer, J., dissenting).

In her Response, Morris argues that "[t]he analogies drawn by Defendants comparing [American Freightways] to ServiceMaster [are] completely misguided. ServiceMaster was contractually obligated to reimburse Zurich [American] up to the $3,000,000 deductible," whereas the same cannot be said for American Freightways. [DN 41-1, at 16.] By way of Reply, Zurich American concedes that "American Freightways was not truly self-insured under Kentucky law," but maintains its argument that the Kentucky Supreme Court treated the company as a self-insured entity without reference to that court's above-quoted statement explicitly referencing American Freightways' compliance with 49 U.S.C. § 31139(b) and (e) and its status as an interstate motor carrier. *See Davidson*, 25 S.W.3d at 95.

> Justice Donald Wintersheimer noted the following in his dissent:
>
> American Freightways has its own Property and Casualty Claims Department, with a director, adjusters and investigators. It conducts negotiations with claimants. Decisions on settlements are made within the department as long as the claims are within the deductible/self-retention sum of less than $250,000. The claims department took the position that American Freightways was not totally responsible for the accident but only 60 percent liable. It is obvious that these activities are those which an insurance company regularly performs.

*Id.* at 105 (Wintersheimer, J., dissenting). Nowhere in the parties' briefs or attached exhibits is there any indication that ServiceMaster possesses any such department, retains employees in those positions, or engages in any of the actions in which American Freightways did when it *acted like its own insurer*. Indeed, Zurich American and not ServiceMaster was the payor of Morris's underlying claim. Also of great importance, though, is the fact that Morris has not here sued ServiceMaster, as the Davidsons sued American Freightways, nor was ServiceMaster made

a part of the lawsuit by Zurich American vis à vis third-party practice. Instead, Morris sued the insurance company who made a contract with ServiceMaster, the result of which was Zurich American deciding to settle a claim with Morris stemming from the underlying incident.

Notwithstanding this, Zurich American cites to numerous cases in support of its argument for ServiceMaster's self-insured status, some of which merit discussion by the Court. The first is *Delamar v. Mogan*, 966 F. Supp. 2d 755 (W.D. Ky. 2013). There, the plaintiff, Andy Delamar, filed a claim with his insurance company, Global Indemnity Group, ("GIG"), after his restaurant burned down in Clay, Kentucky. *Id.* at 756. GIG, in turn, "hired an adjusting company, Cunningham Lindsey, to adjust [Delamar's] claim related to the fire loss. Linda Mogan, an adjustor employed by Cunningham Lindsey, assisted in this effort." *Id.* Eventually, Delamar filed a breach of contract and bad faith action against GIG, Cunningham Lindsey, and Mogan, which was removed to the Western District of Kentucky from Webster County Circuit Court. *Id.* The issue in *Delamar*, though, was whether Mogan, the individual adjuster, had been fraudulently joined by Delamar in order to defeat diversity jurisdiction (both Delamar and Mogan were Kentucky residents). *Id.* at 756-57. In dismissing Mogan from the action as fraudulently joined, the district court stated that, as an individual adjuster, "Mogan did not have a contractual obligation to pay the claim or any other contractual relationship with the Plaintiff, [and so] there is no 'reasonable basis' to suggest that Kentucky would hold Mogan individually liable for bad faith under either the common law or statutory scheme." *Id.* at 759. However, as Morris correctly points out in her Response, "[t]he *Delamar* court did not analyze whether the adjuster, acting as the agent for the insurer, could trigger liability on behalf of the insurer." [DN 41-1, at 17.] But more than that, the case currently before the Court does not involve an individual adjustor, the procedural posture is quite different and, apart from general statements of law with which this

Court agrees, *i.e.*, that the lack of a contractual relationship or obligation precludes liability for bad faith, *Delamar*, 966 F. Supp. 2d at 759, that case is quite different from this one.

The next case to which Zurich American cites is *Prout v. PRG Real Estate Mgmt., Inc.*, 51 F. Supp. 3d 702 (E.D. Ky. 2014). There, the plaintiff, while residing at an apartment complex in Lexington, Kentucky, slipped and fell on a sidewalk located within the complex. *Id.* at 704. The plaintiff claimed that the sidewalk was unreasonably dangerous, and reported the incident to the complex's owner, PRG. *Id.* Thereafter, PRG put the plaintiff in contact with ESIS, Inc., the third-party administrator for PRG's self-insurance plan. *Id.* The plaintiff claimed that ESIS engaged in bad faith through its handling of her claim and sued. *Id.* Upon moving for summary judgment, ESIS and PRG, like Zurich American in this case, argued that the involved insurance company acted as a third-party administrator and that the company, PRG, (or here, ServiceMaster), was self-insured. *Id.* at 704-05. However, in *Prout*, the district court specifically referenced, and based its decision to grant ESIS's motion on, a "risk management services agreement" entered into by ESIS and PRG. *Id.* "The document outline[d] the terms of Defendants' agreement, making clear that claim payments were the obligation of PRG, not ESIS. Plaintiff…failed to dispute the authenticity of the contract or to identify any evidence indicating that ESIS was actually an insurer." *Id.* at 705. The district court did not go into detail concerning the agreement between ESIS and PRG, but merely noted that the "agreement demonstrate[d] that ESIS, as PRG's claims administrator, had no contractual obligation to make payment to Plaintiff." *Id.*

There is no such certainty here, and Zurich American does not cite to any such language in its agreement with ServiceMaster which would lead this Court to conclude that *Prout* applied here. The agreement between Zurich American and ServiceMaster *is* attached to the instant

Motion, though, and refers to ServiceMaster as the "insured" party and to Zurich American as the provider of that insurance. [DN 23-4, at 2, 5.] The decision in *Prout* will not cause this Court to change course on Defendants' argument here.

Finally, Zurich American cites to *Madison v. Nationwide Mut. Ins. Co.*, No. 1:11-cv-157, 2012 WL 692598 (W.D. Ky. Mar. 2, 2012), a previous decision of this Court. However, *Madison*, like *Delamar*, outlined above, dealt with the fraudulent joinder of a claims adjustor to a case to defeat federal diversity jurisdiction. The issue here is not whether Morris may maintain a claim for bad faith against an individual claims adjustor employed by Zurich American or by ServiceMaster, and this Court stated in *Madison* that a complete reading of *Davidson* shows that "the [KUCSPA] was clearly intended to regulate the conduct of *insurance companies*," and that the plaintiff "ignore[d] the Kentucky Supreme Court's statement that there must be a contractual obligation." *Id.* at *2 (internal quotation marks and citations omitted) (emphasis added). Zurich American is an insurance company, the type of entity the KUCSPA was designed to apply to, and Morris has sued no adjustors. Simply put, while *Madison* provides instruction on the question of individual claims adjustors, it does not provide any revelations with respect to the specific facts of this case.

Zurich American has not provided, by way of evidence, any indication that ServiceMaster complied or attempted to comply with the required steps to become self-insured under Kentucky law, or that ServiceMaster complied with some federal law-equivalent, or that ServiceMaster had or has specific personnel and policies in place to act as self-insured. The case law to which Zurich American cites does not provide this Court with cause to determine that ServiceMaster was self-insured, either. All of this leads the Court to conclude that Zurich American's argument must fail on this front.

### 6. The *Wittmer v. Jones* Test

Even after having dispensed with Zurich American's self-insurance argument, a genuine dispute of material fact still must be shown by Morris in order to preclude summary judgment. The Court will now turn its attention back to the *Wittmer v. Jones* three-part bad faith test. Zurich American next argues that, even assuming that it was obligated to pay Morris's underlying tort claims, she still cannot meet that three-part test, outlined above. That test bears repeating here:

> (1) The insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed.

*Davidson*, 25 S.W.3d at 100. With respect to element one, notwithstanding its previous argument that ServiceMaster was self-insured, Zurich American argues that "Morris's [underlying] tort claims against Edgar Heinkel and his employer were always genuinely disputed." [DN 23-2, at 12.] And "[b]ecause Kentucky insurers are only obligated to pay claims when liability is 'beyond dispute,'" Morris's claim must fail. [*Id.*] As Zurich American correctly points out, "the beyond-dispute rule gives Kentucky insurers the right to litigate claims that are genuinely disputed without making settlement offers." [*Id.* (citing *Philadelphia Indemnity Ins. Co. v. Youth Alive, Inc.*, 732 F.3d 645, 650 (6th Cir. 2013); *Lee v. Med. Protective Co.*, 904 F. Supp. 2d 648, 656 (E.D. Ky. 2012)).] Notably though, the Sixth Circuit in *Youth Alive* also provided the caveat that "a disputed factual matter—such as a disagreement over the appropriate valuation of the loss—will not always preclude a bad-faith claim as a matter of law…." *Youth Alive*, 732 F.3d at 650.

Zurich American points out that "Morris filed interrogatory answers in March 2012 claiming $1,900,000 in damages. Morris ultimately accepted less than ten percent of that amount

to settle her tort claims. By accepting approximately 90% less than what she once claimed in damages," Zurich American argues that Morris herself has "proved that her tort claims were genuinely disputed…." [DN 23-2, at 13-14.] This disparity is evidenced by the Stengl Affidavit as well as Morris's responses to Defendants' interrogatories, wherein she stated that her claim was worth $1,900,000. In her Response, Morris does not contend that she ever made demands of $3,000,000 or more, nor does she deny that her interrogatory response indicated that she believed her claim to be worth $1,900,000. Instead, Morris argues forcefully that, despite Zurich American's generalized contentions that the underlying claim was genuinely disputed, and Stengl's accompanying affidavit indicating the same, liability was never actually at issue, and the correct figure for the Court's examination is her initial, pre-litigation settlement offer of $175,000. Morris contends that "[i]t was clear from the day of the accident in 2008 Zurich's insured, Mr. Edgar Heinkel was at fault. The claim was 'beyond dispute' and adverse to Zurich." [DN 41-1, at 21.]

There are two key things at issue here with respect to the underlying incident: the first is that while Zurich American focuses exclusively on the disparity between the figure in Morris's 2012 interrogatory response of $1,900,000 and the ultimate settlement figure of $116,432, the Court makes note of the fact that Morris's initial settlement demand was for $175,000, and was made before the underlying litigation commenced. [*See* Morris Dep. 52:21-23.] Of course, that number later rose significantly in her interrogatory response, but her initial demand was close to the ultimate settlement figure, which is not unimportant.

The second, related issue, is the difference between genuine disputes concerning liability and "pertinent facts or law" and genuine disputes concerning "the appropriate valuation of the loss." *See Youth Alive*, 732 F.3d at 650. The former constitutes "a reasonable and legitimate

reason for an insurance company to litigate a claim," while the latter will not necessarily foreclose a plaintiff's ability to bring suit for bad faith. *Id.* Here, Zurich American offers little more than conclusory statements that Morris's underlying claim was always genuinely disputed, relying almost exclusively on the disparity between the figure claimed in her interrogatory responses ($1,900,000), and the ultimate settlement figure ($116,432). [*See* DN 23-2, at 12-14.] And indeed, in its Reply, Zurich American actually concedes the following: "We agree that, after an initial investigation, fault regarding Morris's accident was reasonably clear. But that left the value of her underlying claims to be determined." [DN 56, at 7.]

Crucially though, Zurich American persists in its argument that valuation was hotly contested, largely because it focuses on the larger figure of $1,900,000. Zurich American contends that "Morris initially asserted that her underlying claims were worth $175,000. But then she changed the value to $1,900,000….The fact that she settled for less than $120,000 proves that Zurich American was never obligated to pay either amount." [DN 56, at 7.] Zurich American's argument here lacks merit; the mere fact that the ultimate figure decided upon in settlement did not match precisely Morris's initial demand does not, and indeed should not, defeat her claim. The initial demand of $175,000 and the agreed-upon settlement figure of $116,432 are sufficiently close for the Court to decide, when coupled with Zurich American's concession of Heinkel's fault in the accident, that Morris has carried her burden on this element. While Morris later raised her estimated value of the claim to $1,900,000 in the 2012 interrogatory response, the Court focuses its attention on her initial, pre-litigation demand for purposes of this element.

The second element of a bad faith claim requires that "the insurer…lack a reasonable basis in law or fact for denying the claim…." *Davidson*, 25 S.W.3d at 100. The Court is satisfied

that Morris has carried her burden here, as well. Zurich American has already conceded that, upon initial investigation, fault was clear. [DN 56, at 7.] And while Zurich American persists in its argument that the ultimate comparison the Court should make with respect to valuation should be between Morris's $1,900,000 claim and the $116,432 settlement figure, the Court is not inclined to do so. This is because the $1,900,000 figure was provided by Morris in response to an interrogatory in March 2012, after litigation had commenced and Zurich American had ignored her initial settlement offer of $175,000, made before she filed the underlying lawsuit. [DN 41-1, at 3.] Zurich American proffers rhetorical questions such as "there was a fair debate regarding the value she was placing on the claims. Was she claiming $175,000 or $1,900,000? That in itself was fairly debatable." [DN 56, at 12-13.] However, it remains uncontested that Morris's initial settlement demand, made prior to filing suit, was for $175,000, and while her number increased significantly later, the Court is satisfied that it is this first number, and not the $1,900,000 figure, that should hold the Court's attention. Indeed, in her state court Amended Complaint, it is the $175,000 upon which Morris bases her claim anyways. [DN 1-2, at 3-4.] This, coupled with the fact that Zurich American has admitted that liability was clear upon initial investigation, leads the Court to conclude that Morris has carried her burden on this element.

The final element of a bad faith claim requires that the plaintiff "show[] that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed." *Davidson*, 25 S.W.3d at 100. In the instant Motion, Zurich American's argument spans only one paragraph, and ultimately restates its position as to element two. Specifically, Zurich American argues that the large disparity between Morris's claim for $1,900,000 after litigation started and the ultimate settlement figure of $116,432 indicates that she cannot possibly show "that Zurich American acted intentionally or with reckless disregard of

her rights in refusing to pay her tort claims before they were paid." [DN 23-2, at 15.] In its Reply, Zurich American elaborates, correctly noting that, under Kentucky law, "there must be sufficient evidence of intentional misconduct or reckless disregard of the rights of an insured or a claimant to warrant submitting the right to award punitive damages to the jury." *Wittmer*, 864 S.W.2d at 890.

Morris contends that "Zurich [American] was non-responsive or so [s]low in any response to settlement requests, none of the responses can be characterized as 'in good faith.'" [DN 41-1, at 25.] However, Morris does not offer a great deal of actual evidence to support this contention. As Zurich American correctly points out, the plaintiff must provide "proof of bad faith sufficient for the jury to conclude that there was conduct that was outrageous," and "that mere delay in payment does not amount to outrageous conduct absent some affirmative act of harassment or deception." *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 452 (Ky. 1997) (citing *Zurich Ins. Co. v. Mitchell*, 712 S.W.2d 340 (Ky. 1986)). Thus, the Court must look to the evidence presented by the parties to determine whether it reflects a mere delay, or whether there is evidence of some affirmative act on the part of Zurich American sufficient to present a jury question.

As noted above, the underlying accident occurred on September 18, 2008. [DN 1-2, at 2.] Morris's initial settlement offer of $175,000 did not occur until July 20, 2011. [*See* DN 41-2, at 3 (Morris Affidavit); DN 41-14 (Demand Letter from Morris's previous attorney, Kevin Monsour).] In her affidavit, Morris avers that "Zurich [American] never responded to the written demand." [DN 41-2, at 3.] She goes on: "I filed suit…on September 19, 2011," and did not submit an additional offer until "October 1, 2014 in the amount of $125,000." [*Id. See also* DN 41-15, at 22 (Demand Letter from Morris's previous attorney, Kenneth Haggard).] Zurich

American does not appear to contest the fact that no response was provided to Morris with respect to her first settlement demand of $175,000, and presents no evidence that it did so. However, Zurich American does state the following: "Morris claimed that $25,000 of the demand was for medical expenses. *She provided ER, chiropractic, and pain-management records*, plus an unsupported contention that she would need $50,000 in future medical care." [DN 56, at 13 (emphasis added).] These figures are reflected in Monsour's Demand Letter to Zurich American on behalf of Morris. [*See* DN 41-14.] Of course, the implication of Morris showing that she made a settlement offer in July 2011, filed suit in September 2011, but then the next round of settlement talks consisted of Morris making a lower offer of $125,000 in October 2014, is that Zurich American never made a counteroffer during that time. Indeed, there is no indication in the Record that Zurich American did anything other than ignore Morris's initial offer. The first evidence of Zurich American actively engaging in settlement talks comes from Morris's affidavit, in which she avers that, at some point between her October 2014 offer of $125,000 and the ultimate settlement in July 2015, Zurich American made successive oral offers of $25,000, $75,000, and $100,000, all of which she rejected.[5] [*See* DN 41-2, at 3.]

Here, the timeline becomes especially important because, at the time Zurich American offered Morris $25,000 to settle, her then-attorney, Charles Haggard, had sent two letters to Kaycee Hopwood of Zurich American. In those letters, he purportedly enclosed "a copy of all the bills pertaining to [Morris's] treatment as a result of the September 18, 2008 accident." [DN 41-15, at 23.] Contained in the same exhibit attached to Morris's Response is a one-page document totaling her medical expenses; there are fourteen different items for a total of $44,181.72. [*Id.* at 24.] Haggard also notes, in the second letter, "[a]s you are aware, we have

---

[5] Morris's state court Amended Complaint indicates that these offers began sometime in 2015, but does not provide a specific date. [*See* DN 1-2.]

hard medical expenses in the amount of $43,459.272 [sic]….”[6] [*Id.* at 22.] Although these two figures differ by around $700, they both exceed Zurich American's subsequent oral offer of $25,000 by a great deal. In neither its instant Motion nor its Reply to Morris's Response does Zurich American discuss the oral settlement offers of $25,000, $75,000, or $100,000, focusing instead on Morris's offers of $175,000, $125,000 and her interrogatory response indicating that her case was worth $1,900,000.

However, Zurich American *does* provide that, after "Morris made a $175,000 pre-lawsuit demand in July 2011…[n]othing significant settlement-wise happened after that until Kenneth Haggard asserted a $125,000 demand for Morris in October 2014." [DN 56, at 14.] In other words, Zurich American does not deny Morris's averment that it simply failed to respond or otherwise counter her initial $175,000 settlement offer. Morris avers in her affidavit that "Zurich never responded to the written demand" for $175,000. [DN 41-2, at 3.] She further avers that "Zurich was non-responsive to the written offer to settle" for $125,000. [*Id.*] The Court holds that this presents a jury question concerning whether Zurich American's delay or, stated differently, its nonresponsiveness, and/or its $25,000 settlement offer, made after documentation was provided which showed (or at least alleged) hard medical costs equal to or exceeding that amount, contravenes the KUCSPA's requirement "that a good faith attempt be made to effectuate a prompt, fair and equitable settlement." *Glass*, 996 S.W.2d at 454.

Zurich has presented evidence that Morris changed attorneys multiple times, and so some of the delays in the case were probably attributable to Morris.[7] However, the KUCSPA is clear in

---

[6] The actual receipts and/or medical documentation are not attached to any of the parties' briefs. Instead, the Court merely has the attorney letters which make explicit references to those receipts and documentation. Zurich American does not deny that it received any of this, though.

[7] At times, Zurich American focuses on Morris's numerous delays in the time period following the wreck until she made her initial settlement offer in July 2011. [*See* DN 56, at 8-10.] However, such delays in the period *before* any settlement discussions were had do not ultimately bear upon the Court's analysis concerning any alleged bad faith on the part of Zurich American occurring *after* settlement discussions commenced.

its requirements that are placed upon insurance companies. Thus, while Morris may be partially responsible for some of the delays in the underlying case, this does not mean that Zurich American had a lesser duty of compliance; nor would any delays by Morris bear upon whether Zurich American was able or willing to respond promptly (or at all) to Morris's initial settlement offer, especially when liability became clear after Zurich American's "initial investigation." [DN 56, at 7.] Zurich American made a series of low ball offers, most of which were less than the special damages Morris has incurred. Morris essentially held steady to her first two settlement demands of $175,000 and $125,000, finally settling for $116,432. At this time, the Court believes there is a jury issue as to whether Zurich American's delay in settling with Morris after their talks commenced was outrageous conduct, or merely the normal give-and-take inherent in settlement discussions. Accordingly, The Court must deny Zurich American's instant Motion.

### D. Conclusion

For the reasons stated in this Memorandum Opinion, and the Court being otherwise sufficiently advised, **IT IS HEREBY ORDERED** as follows:

1. Defendants' Motion, [DN 23], is **GRANTED** as to the dismissal of Zurich Illinois. The Clerk is directed to remove Zurich Illinois as a party to this action.

2. Defendants' Motion, [DN 23], is **DENIED** as to Morris's bad faith claims.

**IT IS SO ORDERED.**

*Thomas B. Russell*

**Thomas B. Russell, Senior Judge**
**United States District Court**

June 15, 2018

cc:     Counsel of Record

26